**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PAUL HARTMANN, individually and on behalf of all others similarly situated,<br><br>               Plaintiff,<br><br>               v.<br><br>INARI MEDICAL, INC., WILLIAM HOFFMAN, ANDREW HYKES, and MITCH C. HILL,<br><br>               Defendants. | Case No: 24-4662<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff Paul Hartmann ("Plaintiff"), by and through his undersigned counsel, alleges the following based upon personal knowledge as to Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things: (i) a review of U.S. Securities and Exchange Commission ("SEC") filings by Inari Medical, Inc. ("Inari" or the "Company"); (ii) a review and analysis of other publicly available information, including press releases issued by Inari, transcripts of Inari conference calls with analysts and investors, analyst reports concerning Inari, and news articles concerning Inari; and (iii) a review and analysis of other available materials relating to Inari.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal securities class action on behalf of all purchasers of shares of the common stock of Inari between March 10, 2021 through February 28, 2024, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against Inari, William Hoffman ("Hoffman"), the Company's former President and Chief Executive Officer ("CEO"), and a member of the Company's Board of Directors (the "Board"), Andrew Hykes ("Hykes"), the Company's President and CEO, as well as a member of the Board, and Mitch C. Hill ("Hill"), the Company's Chief Financial Officer ("CFO"), all of whom are collectively referred to as the "Defendants."

2.       Inari is a medical device company that specializes in developing, manufacturing and commercializing catheter-based technologies for treating venous thromboembolism ("VTE"), a condition that occurs when a blood clot forms in a vein, usually in the lower leg, thigh, or pelvis.

3.      Throughout the Class Period, Defendants reported revenue growth and "continued U.S. commercial expansion and increased product adoption" that in material part was due to the

success of the Company's marketing and sales activities.

4.      For example, in a March 9, 2021 earnings conference call with analysts and investors, Defendant Hill represented that Inari's revenues for the fourth quarter of 2020, which were up 144% from the same period of the prior year, were "driven by the continued expansion of our sales force, the opening of new accounts and deeper penetration of our products in existing accounts."

5.      Moreover, throughout the Class Period, Defendants represented that the Company's continued revenue growth was attributable to its "growth drivers." Specifically, Defendant Hoffman stated that the Company's first growth driver was the "expansion of [its] sales organization to target new hospitals and physicians," and that the Company's second growth driver was "building awareness and driving deeper adoption at existing hospital customers," which included the "education and training of noninterventional physicians . . .  who are responsible for treatment decisions for these patients." In discussing the Company's second growth driver further, Defendant Hoffman stated that "our sales professionals routinely visit with these noninterventional physicians in the current less restrictive environment, often inviting them to observe Inari procedures."

6.      However, unknown to investors, Defendants failed to disclose that the Company's reported revenue growth and sales and marketing success was due in material part to meals and consulting service payments provided to health care professionals by the Company that were in violation of the federal Anti-Kickback Statute and Civil False Claims Act.

7.      On February 28, 2024, after the close of trading, investors began to learn the truth when the Company held a conference call with analysts and investors during which it disclosed receipt of a civil investigative demand in December 2023 from the U.S. Department of Justice

("DOJ") "requesting information primarily related to meals and consulting service payments provided to healthcare professionals."   On February 29, 2024, before the market opened, the Company filed its annual report for the year ended December 31, 2023 with the SEC on Form 10-K ("2023 10-K") in which the Company further disclosed the following concerning the DOJ's investigation:

> In December 2023, we received a civil investigative demand ("CID") from the U.S. Department of Justice, Civil Division, in connection with an investigation under the federal Anti-Kickback Statute and Civil False Claims Act (the "Investigation"). The CID requests information and documents primarily relating to meals and consulting service payments provided to health care professionals ("HCPs"). We are cooperating with the Investigation. We are unable to express a view at this time regarding the likely duration, or ultimate outcome, of the Investigation or estimate the possibility of, or amount or range of, any possible financial impact. Depending on the outcome of the Investigation, there may be a material impact on our business, results of operations, or financial condition.

8.      As a result of this disclosure, Inari's share price declined from a closing price of $58.26 per share on February 28, 2024 to close at $46.12 per share on February 29, 2024, a decline of over $12 per share or approximately 21% on heavier than average volume of over 6 million shares traded.

9.      In response to the disclosure, analysts that follow the Company reacted negatively and downgraded the stock.  For instance, Piper Sandler downgraded Inari from overweight to neutral and reduced its price target from $85 per share to $55 per share, stating that that it was moving to the sidelines due to the DOJ investigation and concerns regarding Inari's business overall.  Likewise, a Needham analyst stated that the investigation will create an overhang on the stock and some near-term selling pressure on the Company's shares and could take years to resolve.

10.     As of the close of trading on June 17, 2024, Inari stock had not recovered, closing at $43.23 per share.

11.     As a result of Defendants' wrongful acts and omissions, and the substantial decline

in the market value of the Company's common stock, Plaintiff and other class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

12.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

13.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District. Inari's common stock trades on the NASDAQ in this District, and Inari's management team presented at investor conferences in this District, including the 21st Annual Morgan Stanley Global Healthcare Conference on September 11, 2023, and the Baird Global Healthcare Conference on September 12, 2023.

15.    In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and facilities of the national securities markets.

## III.    PARTIES

16.    Plaintiff purchased Inari common stock at artificially inflated prices during the Class Period and was damaged thereby.

17.    Defendant Inari is incorporated in Delaware and has its principal executive offices at 6001 Oak Canyon, Suite 100, Irvine, California.  Inari purports to be a manufacturer of medical devices focusing on developing, manufacturing, and commercializing catheter-based

technologies for treating VTE.  Inari's common stock trades on the NASDAQ in this District under the ticker symbol "NARI."

18.     Defendant Hoffman was the Company's President and CEO, and a member of the Board at the start of the Class Period through January 1, 2023, when he was succeeded by Defendant Hykes. At all relevant times after January 1, 2023, Defendant Hoffman continued to serve as a member of the Board.

19.     Defendant Hykes is the Company's President and CEO, as well as a member of the Board.  He served as the Company's Chief Operations Officer before his appointment as President and CEO of the Company.

20.     Defendant Hill at all relevant times served as Inari's CFO.

21.     Defendants Hoffman, Hykes, and Hill are collectively referred to as the "Individual Defendants." During the Class Period, the Individual Defendants managed the Company, overseeing its operations as well as finances, and made the materially false and misleading statements described below.  The Individual Defendants, by virtue of their positions, had extensive knowledge about the core aspects of Inari's financial and business operations.  They were also deeply involved in deciding which disclosures would be made by the Company to its investors. Because of their positions and access to material non-public information available to them, the Individual Defendants knew or at least recklessly disregarded that the adverse facts that had not been disclosed to, and were being concealed from, the public, and the positive representations which were being made were materially false and misleading at the time they were made.

## IV.   SUBSTANTIVE ALLEGATIONS

22.     Inari purports to manufacture products for patients suffering from VTE and other vascular diseases and conditions, including chronic venous disease, small vessel

thrombosis, arterial thromboembolism and chronic-limb-threatening ischemia.

23.     The Company's products are reportedly covered under federal healthcare programs such as Medicare and Medicaid.

24.     The Anti-Kickback Statute prohibits persons or entities from knowingly and willfully soliciting, offering, receiving, or providing remuneration, directly or indirectly, in exchange for, or to induce, either the referral of an individual, or the furnishing, arranging for or recommending a good or service for which payment may be made in whole or part under federal healthcare programs, such as the Medicare and Medicaid programs.

25.     The False Claims Act imposes liability on any person or entity that, among other things, knowingly presents, or causes to be presented, a false or fraudulent claim for payment by a federal healthcare program.

## V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS

26.     After the markets closed on March 9, 2021, Inari announced its financial results for the year ended on December 31, 2020. In a press release filed with the SEC on Form 8-K, Defendant Hoffman stated that "[d]uring Q4 we made important progress in our mission to treat and transform the lives of our patients . . . . Our team continues to execute crisply on all five of our growth drivers." The Company attributed its revenue growth to its continued U.S. commercial expansion and increased product adoption.

27.     During the earnings conference call with investors that took place the same day after the close of trading, Defendant Hoffman discussed the Company's reported growth in revenue and procedure volume:

> Our revenue in Q4 was $48.6 million, up over 144% from the same quarter last year and up 26% from Q3. As you know, we pay close attention to procedure volume, as this metric more closely than any other aligns with our mission to treat our patients. And over time, we believe it correlates strongly with revenue.

> During Q4, our physician customers performed approximately 4,600 procedures, up 156% from the same quarter last year and up 24% from Q3.

28.     Defendant Hoffman stated that the following factors contributed to the Company's revenue and procedure growth: (i) the expansion of Inari's sales organization; (ii) building awareness and driving deeper adoption at existing hospital customers; (iii) building upon Inari's base of clinical evidence; (iv) continuing to expand Inari's product portfolio; and (v) expansion into adjacent and international markets. Defendant Hoffman explained:

> We continue to believe that when fully built out, our sales organization will rival in size the largest interventionally focused sales organizations in the market today. We began Q4, as you know, with 120 territories, and we began Q1 with 130 territories. This is consistent with our historical cadence, excluding earlier pandemic anomalies, of adding about 10 territories per quarter.

> Increasingly, this expansion has and will provide opportunity to split territories to focus on our second growth driver, which is building awareness and driving deeper adoption at existing hospital customers. We believe as many as 85% to 90% of PE [pulmonary embolism] patients who can benefit from our FlowTriever system are nonetheless treated with conservative medical management or anti-coagulation alone. Similarly, over 60% of DVT [deep vein thrombosis] patients who can benefit from our devices are managed conservatively.

> Our goal is to access this patient population by educating and communicating regularly about the benefits of large volume clot removal with the noninterventional physicians who manage these patients, again, such as the emergency physicians, pulmonologists, hospitals, and intensivists. . . .

29.     After conclusion of Defendants Hoffman and Hill's prepared remarks, an analyst from BofA Securities asked "if you could maybe take a little bit of a step back for us and just highlight what you think is driving the inflection now . . . because it really is quite a remarkable last 12 months in terms for your performance in the United States." Defendant Hykes responded to this question, in pertinent part:

> So it's the expansion of the field team and the methodical addition of new reps and territory expansion. I think we are making progress in driving deeper and deeper penetration into our existing accounts. And some of the investments and programs we've developed along those lines, I think, are really starting to bear fruit.

30.     Also during the Q4 2020 earnings call on March 9, 2021, an analyst from BTIG, LLC posed a follow up around gross margins: "Your Q4 gross margins, again, very stellar. And I know in the past, there's been some talk about pricing trends and that gross margins aren't necessarily going to stay at this very healthy level. So I wondered if you could help us think about that, given some of the new products you have rolling out . . .". Defendant Hill responded, in pertinent part:

> Should we ever need to respond from a competitive point of view to price – sort of pricing, we could. We're not currently seeing that. And I think we've been very successful selling our services to the hospitals based on the value of the procedure essentially compared to the alternative interventional techniques . . . .

31.     BTIG released an analyst report that same day titled "NARI Leapfrogs Our Projections with Guidance That Calls for 65% Y/Y Sales Growth – and Still Looks Achievable; Raising PT from $125 to $135." The report noted that "[t]here was little to mar NARI's report, with management noting strong volume growth (+24% sequentially in Q4), higher penetration within existing centers, and new accounts being added at a steady clip . . . We know that high-multiple MedTech stocks have been hit hard in recent days, but we continue to think that NARI's topline growth, margin strength, deep pipeline of potential expansion opportunities, and clear ability to execute are unrivaled."

32.     Also on March 9, 2021, after the market closed, Inari filed its annual report for the year ended December 31, 2020 with the SEC on Form 10-K ("2020 10-K"), which was signed by Defendants Hoffman and Hill.  The 2020 10-K repeated the financial results reported in the Company's March 9, 2020 press release.

33.     In the risk factors portion of the 2020 10-K filed with the SEC, the Company disclosed:

> If our operations are found to be in violation of any of the federal . . . [Anti-Kickback Statute and Civil False Claims Act] or any other current or future fraud

and abuse or other healthcare laws and regulations that apply to us, we may be subject to significant penalties, including significant criminal, civil, and administrative penalties, damages, fines, exclusion from participation in government programs, such as Medicare and Medicaid, imprisonment, contractual damages, reputation harm and disgorgement and we could be required to curtail, restructure or cease our operations. Any of the foregoing consequences will negatively affect our business, financial condition and results of operations.

34.     Over the next two trading days, the price of Inari stock increased by about 26%, from a closing price of $99.34 per share on March 9, 2021, to an all-time high closing price of $125.92 per share on March 11, 2021.

35.     On May 11, 2021, Inari reported its financial results for the quarter ended March 31, 2021. In its press release accompanying its Form 8-K filed with the SEC on the same date, the Company reported an increase in revenue of 18% from the previous quarter as well as the expansion of its commercial footprint. The Company attributed the increase in revenue to "continued U.S. commercial expansion and increased production adoption." Further, Defendant Hoffman stated that Inari "treated a record number of patients and significantly expanded [its] commercial footprint."

36.     Also on May 11, 2021, Defendants held an earnings conference call with analysts and investors. During the conference call, Defendant Hoffman discussed the Company's reported growth in revenue and procedure volume:

> Our revenue in Q1 was $57.4 million, up $30.4 million or 113% from the same quarter last year and up $8.8 million or 18% from Q4. During Q1, our physician customers performed approximately 5,500 procedures, up about 130% from the same quarter last year and up about 20% from Q4.

37.     Defendant Hoffman repeated that the factors delineated above in Paragraph 28 contributed to the Company's growth.  Defendant Hoffman further explained:

> First, we continue to expand our sales organization to target new hospitals and physicians. . . . .
>
> We have historically stated our intent to add an average of 10 territories per quarter.

However, based on our consistent success to date and our scalable approach to commercial expansion, we now believe we can be more aggressive with our hiring plan. We are currently targeting 180 to 200 new territories by the end of 2021. We believe that increased density of our sales organization and the resulting smaller and smaller territories provide opportunity to more effectively address our second growth driver, which is building awareness and driving deeper adoption at existing hospital customers. As we have discussed in the past, we believe that the vast majority of our target PE and DVT patient populations are currently treated with anti-coagulation alone. While changing this paradigm is a complex challenge, our approach is simple and straightforward.

First, we will continue to educate and train the noninterventional physicians such as emergency department physicians, pulmonologists, intensivists and hospitalists who are often responsible for treatment decisions for these patients . . . We will also communicate directly with these physicians at the local level as we do with our interventional physician customers.

Second, we will work with our hospital customers to establish systematic processes to identify and triage our target patients to the physicians who are experts in these disease states. Our ultimate goal is to establish a scalable model for the development of VTE centers of excellence in which VTE patients are identified, triaged, treated, and followed up in a systematic and consistent manner . . . .

38.     During the question and answer portion of the conference call, an analyst from

BTIG, LLC asked "Can you tell us a little bit more in terms of where you're adding territories?

Are these – are you splitting territories that are already highly productive? How are you thinking

about some of that? I'm trying to consider how productive these new territories might be at start."

Defendant Hoffman replied, in pertinent part:

So almost exclusively now, these are split territories. And we have seen productivity increase just a little bit of our overall sales organization because new sales professionals are starting with just a little bit of a base of business. I suspect that will continue and everybody is going to start with some base of business here. Our goal here is increasingly on the increasing our sales organization so that we can drive deeper adoption.

Smaller territories allow us to communicate more effectively with non-interventional stakeholders communicate with administration about the development of real programs to more systematically identify PE and DVT patients. And triage them to physicians who have the skill sets to actually intervene if appropriate.

39.     Industry analysts viewed the Company's statements regarding its growth and

revenues positively. For example, Canaccord Genuity released a report on the same date titled "Continued investments in feet on the street should keep the beat-and-raise momentum intact; reaffirm BUY, PT to $132." The report also noted the Company's "solid quarter of revenue and procedural growth rate," as well as Inari's accelerated "pace of its sales force expansion to support both new hospital and physician acquisition . . .".

40.     Also on May 11, 2021, Inari reported its financial results for the quarter ended March 31, 2021 on form 10-Q with the SEC ("1Q 2021 10-Q"), which was signed by Defendants Hoffman and Hill. The 1Q 2021 10-Q repeated the financial results reported in the Company's press release and incorporated by reference the risk warnings contained in the 2020 10-K delineated above.

41.     On August 10, 2021, the Company announced its financial results for the quarter ended June 30, 2021 in a press release accompanying a Form 8-K filed with the SEC.  Inari again reported increased revenue stating "[r]evenue was $63.5 million for the second quarter of 2021, compared to $57.4 million for the prior quarter and $25.4 million for the second quarter of 2020." Inari attributed this revenue growth to "continued U.S. commercial expansion and new product introductions."

42.     Defendant Hoffman stated that the Company's "second quarter was highly successful . . . [w]e treated a record number of patients" and "continue to invest aggressively to expand our capabilities to treat even more patients and address more unmet needs."

43.     Also on August 10, 2021, Defendants hosted a conference call with analysts and investors. During the call, Defendant Hoffman represented:

> Our second quarter was productive and successful in terms of financial performance, and we again treated a record number of patients.
>
> Our revenue in Q2 was $63.5 million, up $38.1 million or 150% from the same quarter last year and up about $6.1 million or 10.6% from Q1. As in the past, the

vast majority of revenue in the quarter came from replenishment of inventory after procedures. While the balance came from stocking orders, which, as always, include initial inventory purchased by new customers, increases in inventory levels at existing customers as they grow and increasingly important, from stocking orders for new product introductions.

During Q2, our physician customers performed approximately 5,900 procedures, including a modest number of cases from Europe. This procedure count is up about 136% from the same quarter last year and up about 7.3% from Q1.

44.     Also during the call, Defendant Hoffman elaborated on the Company's growth drivers:

The increasing density of our sales organization and the resulting smaller territories provide opportunity to more effectively address our second growth driver, which is building awareness and driving deeper adoption at existing hospital customers. As we described earlier, a high percentage of our target PE and DVT patient populations are currently treated with anticoagulation alone. Education and training of noninterventional physicians, such as emergency department physicians, pulmonologists, intensivists and hospitalists, who are responsible for treatment decisions for these patients is important.

We can be in both in-person and Zoom-based training of these physicians in groups and individually and in addition, our sales professionals routinely visit with these noninterventional physician in the current less restrictive environment, often inviting them to observe Inari procedures. Smaller territories have been especially useful for these efforts.

We are also working with our hospital administrators to establish VTE programs in which systematic processes are installed to identify and triage our target patients to physicians who are experts in these disease states. These efforts continue to show tangible progress. Several of our hospital customers, for example, recently committed resources to hire dedicated VTE coordinators.

45.     Also on August 10, 2021, the Company filed its quarterly report for the quarter ended June 30, 2021 on Form 10-Q with the SEC ("2Q 2021 10-Q"), which was signed by Defendants Hoffman and Hill. The 2Q 2021 10-Q repeated the financial results reported in the Company's press release and incorporated by reference the risk warnings in the 2020 10-K delineated above.

46.     BTIG released a report on the same day titled "Deluge of New R&D and Products

on the Way; Another Healthy Beat and Guidance Raise Despite Dwindling COVID Tailwind." The report noted that "[t]he company again set a new record for number of patients treated" and that "we are impressed by the sustainable growth NARI demonstrated this quarter as new sales reps, deeper penetration into existing accounts, new products, share take and market expansion continued to drive volumes."

47.     Also on August 10, 2021, Canaccord released a report titled "A beat with a lot to explain, but a solid quarter regardless; reaffirm BUY, PT to $119." The report noted that "Inari reaffirmed its five growth drivers: continued commercial expansion to drive deeper utilization, more clinical data generation, adding more products to the bag, international expansion, and eventual expansion into adjacent markets . . .".

48.     On November 9, 2021, Inari issued a press release announcing its earnings for the quarter ended September 30, 2021 that was filed with the SEC on Form 8-K. Defendant Hoffman stated that "[o]ur third quarter was as successful as it was exciting. We again treated a record number of patients and made important progress in all five of our growth drivers." The press release stated that revenue "was $72.9 million for the third quarter of 2021, compared to $63.5 million for the prior quarter and $38.7 million for the third quarter of 2020." The Company attributed this increase in reported revenue to "continued U.S. commercial expansion and new product introductions."

49.     Defendants hosted an earnings conference call with analysts and investors that same day. During the call, Defendant Hoffman represented:

> Our revenue in Q3 was $72.9 million, up $34.2 million or 88% from the same quarter last year and up $9.4 million or 15% from Q2.
>
> Procedure growth was robust. Our physician customers performed approximately 6,700 procedures, including a modest number of cases from Europe. This procedure count is up from 5,900 or about 14% from Q2.

Despite the continued questions about COVID and its impact on our business, we have made steady progress on all of our growth drivers, and we have grown in every single quarter since the pandemic began in Q1 of 2020. In fact, during the pandemic, we've completed over 30,000 procedures and nearly tripled our quarterly production of both cases and revenue. We added 500 new customer accounts, hired and trained over 100 new sales professionals, developed our VTE excellence program to drive deeper adoption, created and executed our Clot Warrior Academy online training and education platform, which has now reached over 4,500 customers.

Our first growth driver is the expansion of our sales organization to target new hospitals and physicians. . . .

Our second growth driver is building awareness and driving deeper adoption at existing hospital customers. As you know, a high percentage of our target PE and DVT patient populations are currently treated with anticoagulation alone. Education and training of the noninterventional physicians who are often responsible for treatment decisions for these patients is important, and we continue to engage these physicians effectively.

We are also working with administrators, establish systematic processes to identify and triage VTE patients consistently to the VTE experts. The goal is to establish systems like those adopted for stroke and heart attack patients.

Altogether, these efforts which we have designated our VTE excellence program are yielding encouraging results. More centers, for example, are establishing VTE coordinator positions every quarter, and penetration rates at targeted centers are climbing.

50.     Also on November 9, 2021, Inari filed its quarterly report for the quarter ended September 30, 2021 on Form 10-Q with the SEC ("3Q 2021 10-Q"), which was signed by Defendants Hoffman and Hill. The 3Q 2021 10-Q repeated the financial results reported in the Company's press release and incorporated by reference the risk warnings delineated above in the 2020 10-K.

51.     After the market closed on February 23, 2022, Inari announced its financial results for the year that ended on December 31, 2021 in a press release that was filed with the SEC on Form 8-K.  Defendant Hoffman stated that "our fourth quarter was again successful and productive."  The Company attributed its revenue growth to its continued U.S. commercial

expansion and new product introductions.

52.     During the earnings conference call with analysts and investors that took place the

same day, Defendant Hoffman represented:

> Our revenue in Q4 was $83.2 million, up $34.6 million or 71% from the same
> quarter last year and up $10.3 million or 14% from Q3.
>
> Procedure growth was also strong. Our physician customers performed
> approximately 7,700 procedures, including a modest number of cases from Europe.
> This procedure count is up from 6,700 procedures or about 15% from Q3. Our
> revenue in 2021 was $277 million, up $137.3 million or 98% from the prior year.
>
> Our physician customers performed approximately 25,700 procedures in 2021, up
> 95% from 13,200 procedures in 2020.

53.     Defendant Hoffman repeated that the factors delineated above in Paragraph 28

contributed to the Company's growth.  Defendant Hoffman further explained:

> Our second growth driver is building awareness and driving deeper adoption at
> existing hospital customers. Most VTE patients continue to be treated with
> anticoagulation alone and in fact, a large percentage of these patients never even
> see a physician, who is a VTE expert. We continue to drive awareness of the
> benefits in our procedures with non-interventional physicians and we continue to
> work with hospital administrators to install more systematic processes to
> consistently identify and triage VTE patients to the physicians, who best understand
> the disease state.
>
> We are supporting these efforts by building centralized capabilities, our field team
> can leverage, including a health economics and market access team, a national
> accounts team and the Inari Solutions Group, a team of former hospital
> administrators who can share best practices on disease state program buildings.

54.     Also on February 23, 2022, after the market closed, the Company filed on Form 10-

K with the SEC for its fiscal year that ended on December 31, 2021 ("2021 10-K"), which was

signed by Defendants Hoffman and Hill. The 2021 10-K repeated the financial results reported in

the Company's press release and repeated the risk warning in the 2020 10-K delineated above.

55.     On May 4, 2022, after the market closed, the Company reported its financial results

for the quarter ended March 31, 2022. In the press release accompanying its Form 8-K filed with

the SEC on the same date, Defendant Hoffman stated that "[w]e executed crisply across all five of our growth drivers during a highly productive first quarter." The Company attributed its revenue growth to continued U.S. commercial expansion and new product introductions.

56.     Also on May 4, 2022, Defendants hosted a conference call with analysts and investors. During the call, Defendant Hoffman represented:

> Our revenue in Q1 was $86.8 million, up $29.4 million or 51% from the same quarter last year and up $3.6 million or 4% from Q4 2021. Procedure growth was robust… Procedure count was up from 7,700 cases or about 14% from Q4.

57.     Defendant Hoffman repeated that the factors delineated above in Paragraph 28 contributed to the Company's growth.  Defendant Hoffman further explained:

> Our first growth driver is the expansion of our sales organization. The size of our core TAM is large and our penetration remains under 5%. We're going to need a lot more sales professionals. We committed to at least 275 territories by the end of 2022 and we are on pace to achieve this goal. These increasingly smaller territories position us to execute our second growth driver, which is driving deeper adoption at existing hospital customers.

> Most VTE patients . . . never even see a physician who is a VTE expert. Our goal is to establish patient pathways that are similar to those for heart attack and stroke, so that patients are consistently triaged to VTE experts. We refer to the various parts of our approach collectively as VTE excellence.

> The more constructive post omicron hospital operating environment has been conducive to these efforts, as we are more consistently able to access and educate noninterventional physicians and administrators who are critical to the development of these programs.

58.     Also on May 4, 2022, after the markets closed, the Company filed on Form 10-Q with the SEC its financial results for the quarter ended March 31, 2022 ("1Q 2022 10-Q"), signed by Defendants Hoffman and Hill. The 1Q 2022 10-Q repeated the financial results in the Company's press release and incorporated by reference the risk warning in the 2021 10-K delineated above.

59.     On August 3, 2022, after the market closed, Inari reported its financial results for the quarter ended June 30, 2022.  In its press release accompanying the Form 8-K filed with the

SEC on the same date, the Company reported an increase in reported revenue as well as the expansion of its commercial footprint.  Additionally, the Company likewise reaffirmed the revenue guidance it had previously adjusted upward by $10 million.  The Company attributed its results to "continued U.S. commercial expansion and new product introductions." In a press release issued on the same day, Defendant Hoffman stated that the Company continued to "execute crisply across all five of [its] growth drivers despite the ongoing challenges to the med tech operating environment," "produced robust revenue growth," and "hired its largest class of new sales professionals."

60.     Also on August 3, 2022, Defendants held an earnings conference call with analysts and investors.  During the call, Defendant Hoffman reported revenue growth in his prepared remarks:

> Our revenue in Q2 was $92.7 million, up $29.3 million or 46% from the same quarter last year, and up $5.9 million or 7% from Q1 of 2022. Our core business was strong as we expected. We saw additional revenue based on more rapid-than-expected stocking and adoption of our entry sheets, essentially transferring some of our Q3 expected revenue into Q2.

61.     Defendant Hykes made representations about the Company's growth drivers:

> We're also making solid progress with our second growth driver, producing deeper adoption within existing hospital customers. Most VTE patients, despite our commercial success, never even see a physician with the skills and expertise to make the most informed clinical decisions. Our goal is to establish systems and processes that ensure patients are consistently identified and triaged to VTE expert[s]. As I mentioned, smaller territories are especially useful for this effort.

62.     Also on August 3, 2022, after the markets closed, Defendants filed on Form 10-Q with the SEC its financial results for the quarter ended June 30, 2022 ("2Q 2022 10-Q"), which was signed by Defendants Hoffman and Hill. The 2Q 2022 10-Q repeated the financial results in the Company's press release and incorporated by reference the risk warnings in the 2021 10-K delineated above.

63.     On November 2, 2022, after the markets closed, Inari announced its financial results for the quarter ended September 30, 2022. In a press release accompanying its Form 8-K filed with the SEC on the same date, Defendant Hoffman stated that "[o]ur aggressive investment in our growth drivers is paying off for our mission."  The press release attributed the Company's reported revenue growth to continued U.S. commercial expansion, increased adoption of our procedures, and introduction of new products.

64.     Also on November 2, 2022, Defendants hosted a conference call with analysts and investors. During the call, Defendant Hykes represented:

> Our revenue in Q3 was $96.2 million, up $23.3 million or 32% from the same quarter last year. Results in our core business were driven by strong procedural growth across both ClotTriever and FlowTriever product line . . . We are pleased with how our business performed in Q3 and enthusiastic about how we are positioned for both the remainder of this year as well as 2023.

65.     Defendant Hykes repeated that the factors delineated above in Paragraph 28 contributed to the Company's growth.  Defendant Hykes further explained:

> Our first growth driver is the expansion of our sales organization. You will recall that we committed to at least 275 territories by the end of 2022.

> In Q2 we hired our largest sales class ever, nearly achieving this goal by midyear . . . In Q3, we intentionally hired a smaller group and exited the quarter with just over 275 territories . . . Continued expansion of our sales organization results in smaller and smaller territories. This positions us well to execute on our second growth driver, which is increasing penetration in existing accounts.

> Despite our commercial success, the vast majority of VTE patients continue to be treated with anticoagulation alone and never see a physician with the skills and expertise to make the most informed clinical decisions. Our goal is to establish systems and processes similar to stroke and MI [myocardial infarction] that ensure patients are consistently identified, screened, and evaluated by a VT expert. Our VT Excellence program is a comprehensive and repeatable approach to connecting VTE patients to VT experts. We have invested heavily in this effort, and we believe it is paying off. We are systematically moving customers to the most advanced stage of VT Excellence, and TAM penetration rates at these centers are several times greater than our median customer.

66.     Defendant Hill represented:

18

Compared to Q3 of 2021, our revenue growth was due to continued efforts to open new customer accounts, expand our sales force and deepen our relationship with existing customers.

67.     Also on November 2, 2022, after the markets closed, Defendants filed on Form 10-Q with the SEC its financial results for the quarter ended September 30, 2022 ("3Q 2022 10-Q"), which was signed by Defendants Hoffman and Hill. The 3Q 2022 10-Q repeated the financial results in the Company's press release and incorporated by reference the risk warning in the 2021 10-K delineated above.

68.     On February 27, 2023, Inari announced its fourth quarter and full year 2022 financial results after the market closed in a press release filed with the SEC on Form 8-K. Defendant Hykes reported Inari's double-digit growth and attributed it to continued U.S. commercial expansion, increased adoption of procedures, and introduction of new products. Defendant Hykes further stated that "[c]risp execution across all five of our growth drivers generated robust revenue growth in the fourth quarter."

69.     During the earnings conference call with analysts and investors that took place the same day, Defendant Hykes made representations about the Company's growth drivers:

> Continued expansion of our sales organization results in smaller and smaller territories. This, in turn, positions us well to execute on our second growth driver, which is increasing penetration in existing accounts . . . Our VTE Excellence program is a highly differentiated, comprehensive and repeatable approach to partner with hospitals to do just that. We are leveraging the capabilities we have created and are continuing to see solid progress moving our customers through to the most advanced phases of VTE Excellence, where TAM penetration is several times higher than in the earlier phases.

70.     Also on February 27, 2023, Inari filed its annual report for the year ended December 31, 2022 with the SEC on Form 10-K ("2022 10-K"), which was signed by Defendants Hykes, Hill, and Hoffman.  The 2022 10-K repeated the financial results reported in the Company's press release and repeated the risk warnings in the 2021 10-K delineated above.

71.     On May 3, 2023, after the markets closed, Inari announced its financial results for the quarter ended March 31, 2023. In a press release accompanying its Form 8-K filed with the SEC on the same date, Defendant Hykes stated that "[o]ur strong financial performance in the first quarter reflected consistent execution across all of our growth drivers." The press release attributed the Company's reported revenue growth to continued commercial expansion, increased adoption of our procedures, and introduction of new products.

72.     Also on May 3, 2023, Defendants hosted a conference call with analysts and investors. Defendant Hykes represented:

> Our first quarter was successful and highly productive. Revenue growth was strong, and we executed crisply across all our growth drivers.
>
> Our revenue in Q1 was $116.2 million, up 34% year-over-year and 8% sequentially from Q4 of 2022. The performance was driven by strong underlying procedure growth across the ClotTriever and FlowTriever product lines.

73.     Defendant Hykes repeated that the factors delineated above in Paragraph 28 contributed to the Company's growth. Defendant Hykes further explained:

> Our first growth driver is the expansion of our sales organization. Similar to our most recent quarters, we deliberately moderated the pace of our new sales territory additions exiting the quarter with just over 290 territories.
>
> We are pleased with the resulting sales force operating leverage and productivity gains we're beginning to recognize . . . [W]e expect to continue adding sales professionals each quarter at this more measured cadence and anticipate ending the year with at least 310 territories.  Continued expansion of our sales organization results in smaller and smaller territories. This in turn positions us well to successfully introduce new products to the market and to execute on our second growth driver, which is increasing penetration in existing accounts. . . .
>
> Our VTE Excellence program is a highly differentiated, comprehensive and repeatable approach to help hospitals establish systems and processes similar to stroke an MI that ensure patients are consistently identified, screened, and evaluated by a VTE expert . . . we're making solid progress moving customers through to the most advanced phases of VTE Excellence, where TAM penetration is 3x to 4x higher than in the earlier phases. To-date, most of our efforts with VTE Excellence have been focused at the local account level. However, building on the success we've seen across individual hospitals.

Recently, we've also begun to work with several large IDNs [integrated delivery networks] and GPOs [group purchasing organizations] at their invitation to replicate VTE Excellence on a system-wide basis.

74.    Defendant Hill represented:

Compared to Q1 of 2022, our revenue growth was due to our continued efforts to open new customer accounts, expand our sales force and deepened our relationship with existing customers.

75.    Also on May 3, 2023, after the markets closed, Defendants filed on Form 10-Q with the SEC its financial results for the quarter ended March 31, 2023 ("1Q 2023 10-Q"), which was signed by Defendants Hykes and Hill. The 1Q 2023 10-Q repeated the financial results in the Company's press release and incorporated by reference the risk warning in the 2022 10-K delineated above.

76.    After the markets closed on August 2, 2023, Inari announced its financial results for the quarter that ended on June 30, 2023 in a press release with the SEC on Form 8-K. The Company reported double digit revenue growth, and highlighted that it "delivered net income of $2.1 million in Q2 of 2023, compared to a $10.2 million net loss in Q2 of 2022." Further, the Company disclosed that it was raising its revenue guidance to a range of $482 million to $492 million, an increase of $4 million, from its prior guidance range of $478 million to $488 million.

77.    During the earnings conference call with investors that took place the same day, Defendant Hykes elaborated on the Company's growth drivers delineated in Paragraph 28 above:

Our first growth driver is expanding our U.S. commercial footprint. We continue to add head count in Q2 and remain on track to meeting our year-end goal. We are pleased with the leverage and productivity gains we are starting to recognize from a more measured pace of territory development.

Continued expansion of our sales organization also results in more focused areas of coverage, positioning us well to introduce new products to the market and to execute on our second growth driver, increasing penetration of existing accounts. VT Excellence is a highly differentiated, comprehensive and repeatable approach to help hospitals establish VT programs and drive deeper penetration of our therapies.

21

> We continue to make progress with VT Excellence. Importantly, we are successfully moving customers along the VT Excellence continuum to more advanced phases of program development, where TAM penetration is 3x to 4x higher than in earlier phases. Our initiatives are building momentum, with increasing top-down traction across several IDN and GPOs, which is quite encouraging.

78.    Also, during the earnings conference call with analysts and investors that took place the same day, Defendant Hill represented the following concerning the Company's financial results:

> Inari's revenues for the fourth quarter of 2022 were $107.8 million, up $24.6 million or 30% from $83.2 million for the same period of the prior year and up 12% or $11.6 million sequentially over the third quarter 2022. Compared to Q4 of 2021, our revenue growth was due to our continued efforts to open new customer accounts, expand our sales force and deepen our relationship with existing customers.

79.    Also on August 2, 2023, after the markets closed, Defendants filed on Form 10-Q with the SEC its financial results for the quarter ended June 30, 2023 ("2Q 2023 10-Q"), which was signed by Defendants Hykes and Hill. The 2Q 2023 10-Q repeated the financial results in the Company's press release and incorporated by reference the risk warning in the 2022 10-K delineated above.

80.    On August 3, 2023, Canaccord Genuity raised its price target, reasoning, among others, that "[t]he VTE Excellence program has been successful in establishing hospital programs to identify and treat patients.  TAM penetration in advanced-phase accounts can be 3-4x than that of earlier phases.  There is also increasing traction building in large IDN and GPOs, which will bolster the VTE Excellence program." Additionally, with regard to the revenue guidance, Piper Sandler noted that Inari has "a good track-record of under-promising and over-delivering," further noting that it was highly achievable as "the guidance could ultimately prove conservative again."

81.    As a result, on August 3, 2023 the price of Inari shares rose to a closing price of $67.63 per share, from the previous trading day's closing price of $55.60 per share, reflecting more

than a 21% increase.

82.     On November 1, 2023, the Company reported its financial results for the quarter that ended on September 30, 2023.  In its press release accompanying the Form 8-K filed with the SEC on the same date, Defendant Hykes stated that the Company "saw meaningful contributions from our core VTE business, new product launches, and international geographies." He further stated that the "core business is thriving, and we are confident in our ability to continue to grow sustainably for years to come. Most importantly, we remain fully committed to continuing to advance our mission of addressing major unmet needs for patients."

83.     On November 1, 2023, during an earnings conference call with analysts and investors, Defendant Hykes, reported that the Company generated record revenue and executed across all its growth drivers, and that the Company was profitable for the first time since 2021:

> Revenue in Q3 was $126.4 million, up 31% year-over-year. Our international business generated revenue of $6.5 million in Q3, up 151% year-over-year and 26% sequentially from Q2. In addition to our topline performance, we also made steady progress during the quarter on our bottom-line and returned to operating profitability for the first time since 2021. This achievement underscores our commitment to invest strategically in the business, while also driving operating leverage with revenue growing at double the rate of OpEx in the quarter.
>
> During Q3, we also made progress across our five growth drivers. . . . Our broad commercial footprint and methodical approach to expansion results in focused areas of coverage, positioning us well to introduce new products to the market and to execute on our second growth driver, increasing penetration of existing accounts.

84.     The statements alleged above in Paragraphs 26-83 were materially false and misleading, and failed to disclose material adverse facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading because: 1) Defendants failed to disclose that the Company's reported revenue growth and sales and marketing success was due in material part to meals and consulting service payments provided to health care professionals by the Company that were in violation of the federal Anti-Kickback

Statute and Civil False Claims Act; 2) the Company warned of risks if the Company's operations

were found to be in violation of any of the federal Anti-Kickback Statute and Civil False Claims

Act laws when at that time the risks had already materialized; and 3) that, as a result of the

foregoing, Defendants' positive statements about the Company's business, operations, and

prospects were materially misleading and/or lacked a reasonable basis.

## VI.    THE TRUTH IS REVEALED

85.    On February 28, 2024, after the close of market hours, the Company reported its

financial results for its fiscal year that ended on December 31, 2023 and held a conference call

during which it disclosed receipt of a civil investigative demand in December 2023 from the DOJ

"requesting information primarily related to meals and consulting service payments provided to

healthcare professionals."

86.    During the conference call with analysts and investors, in response to an analyst

requests for further information about the DOJ's investigation, Defendant Hykes responded:

> [A]s you likely understand from some of the precedent examples of other
> companies navigating these same waters, we're not going to have a lot of additional
> background we're going to be able to share beyond what's in the disclosure. We
> got the CID back in December, so it's still relatively early. We are cooperating with
> the DOJ. We take compliance seriously. Today we always have at every step of our
> commercial activity here in the U.S. going back to 2018. We do not expect that this
> will have any impact on our ability to execute commercially. The focus of the CID
> is described in the 10-K, it's a couple of very specific areas related to healthcare
> professional relationships. Going forward, we'll update you as we can, but again
> based on the precedent I think the timeline is most likely going to be measured in
> years as opposed to months and quarters.

87.    As a result of this news, the price of Inari stock declined over $12 per share or by

approximately 21% on heavier than usual volume.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

88.    Defendants acted with scienter in that they knew, or recklessly disregarded, that the

public documents and statements they issued or disseminated to the investing public during the

Class Period were materially false or misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as well as actions intended to manipulate the market price of Inari common stock, as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Inari, their control over, receipt, and/or modification of Inari's materially false and misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

89.     Defendants knew or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetuated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants. Given their positions with Inari, the Individual Defendants controlled the contents of Inari's public statements during the Class Period. The Individual Defendants were each provided with, or had access to, the statements alleged herein to be false and misleading prior to, or shortly after their issuance, and had the ability as well as the opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were false and misleading. As a result, each of the Defendants is responsible for the accuracy of Inari's corporate statements, and is, therefore, responsible and liable for the representations contained therein.

90.     The Individual Defendants had the motive and opportunity to commit the acts

alleged herein in order to inflate the price of Inari common stock and sell their personal shares at artificially inflated prices, and sold artificially inflated shares of Inari common stock that were unusual and suspiciously timed, and for unusual amounts. The Individual Defendants had the motive (concrete benefits that could be realized by the materially false and misleading statements alleged herein) and the opportunity (the means and likely prospect of achieving concrete benefits by the means alleged) to commit the fraud alleged.

91.    During the Class Period Defendant Hoffman sold 1,729,060 shares of Inari common stock for net proceeds of over $126 million.

92.    During the Class Period Defendant Hill sold 267,500 shares of Inari common stock for net proceeds of over $19 million.

93.    During the Class Period Defendant Hykes sold 324,022 shares of Inari common stock for net proceeds of over $22 million.

94.    Starting on or around March 10, 2022, the Company sold 2.3 million shares of its common stock at the artificially inflated price of $81.00 per share for net proceeds of approximately $174.4 million.

## VIII.   LOSS CAUSATION/ECONOMIC LOSS

95.    Plaintiff and other class members were damaged as a result of Defendants' fraudulent conduct as alleged herein. During the Class Period, Defendants engaged in a scheme to deceive investors by issuing a series of material misrepresentations and omitting material facts, trends, commitments, and uncertainties required to be disclosed relating to Inari's operations, business, financial performance, and future prospects.

96.    As a direct result of Defendants' scheme, misrepresentations of material fact, and omissions of material fact, the price of Inari common stock was artificially inflated throughout the Class Period.

97.    Class members unknowingly and in reliance on Defendants' materially false or misleading statements and/or omissions purchased Inari common stock at artificially inflated prices on the NASDAQ. But for Defendants' misrepresentations, omissions, and fraudulent scheme, Plaintiff and other class members would not have purchased Inari common stock at the artificially inflated prices at which it traded during the Class Period.

98.    The truth regarding Defendants' fraud was revealed in a corrective disclosure that was made on February 28, 2024. In response to this corrective disclosure, the price of Inari stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct was removed from the price of Inari stock.

99.    This decline in the price of  Inari stock following the corrective disclosure is directly attributable to the market absorbing information that disclosed the falsities in or misleadingly omitted from Defendants' material misrepresentations and omissions.

100.    Plaintiff and other class members suffered economic losses as the price of Inari stock fell in response to the corrective disclosure. It was foreseeable that such disclosures would cause the price of Inari stock to decline. Thus, Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiff and other class members.

## IX.    PLAINTIFF IS ENTITLED TO A PRESUMPTION OF RELIANCE

101.    At all relevant times, the market for shares of Inari common stock was an efficient market by virtue of the following reasons, among others: (i) shares of Inari common stock met the requirements for listing, were actually listed, and actively traded on the NASDAQ; (ii) according to the Company's 2023 10-K, Inari had 50,617,254 outstanding shares of common stock as of February 18, 2022; (iii) as a registered and regulated issuer of securities, Inari filed periodic reports with the SEC and NASDAQ, in addition to the Company's frequent voluntary dissemination of information; (iv) Inari regularly communicated with investors via established market

communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services, the Internet, and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; (v) Inari was followed by securities analysts employed by major brokerage firms, who wrote reports that were distributed to the customers of their respective brokerage firms and made such reports publicly available; (vi) the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Inari common stock; and (vii) without knowledge of the misrepresented or omitted facts, Plaintiff and the members of the class purchased Inari common stock between the time Defendants made the material misrepresentations and omissions and the time the truth was revealed, during which period the price of Inari's common stock was artificially inflated as a result thereof.

102.    The market for Inari common stock promptly digested current information regarding Inari from all publicly available sources and reflected such information in the price of Inari common stock. Under these circumstances, all purchasers of Inari common stock during the Class Period who relied upon the integrity of the market price of Inari common stock, including Plaintiff, suffered similar injury through their purchase of Inari common stock at artificially inflated prices, and a presumption of reliance under the fraud-on-the-market doctrine applies.

## X.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

103.    The Private Securities Litigation Reform Act's statutory safe harbor and the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein.

104.    None of the statements complained of herein were forward-looking statements. Rather, each was a historical statement or statement of purportedly current facts and conditions at

the time each statement was made.

105.    To the extent that any materially false or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement or portion thereof. As set forth above, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants do not insulate Defendants from liability for their materially false or misleading statements or omissions.

106.    To the extent that the statutory safe harbor applies to any materially false or misleading statement alleged herein, or any portion thereof, Defendants are liable for any such materially false or misleading forward-looking statement because at the time such statement was made the speaker knew the statement was materially false or misleading, or the statement was authorized and approved by an executive officer of Inari who knew that the forward-looking statement was materially false or misleading.

## XI.    CLASS ACTION ALLEGATIONS

107.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), individually and on behalf of a Class consisting of all purchasers of shares of the common stock of Inari during the Class Period.

108.    Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of Inari, members of Inari's Board, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors, or assigns; (iv) any entity in which Defendants have or had a controlling interest; and (v) any affiliate of Inari.

109.    The members of the class are so numerous that joinder of all members is

impracticable. Throughout the Class Period, Inari's securities were actively traded on the NASDAQ. While the exact number of class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery from Defendants, Plaintiff believes that there are at least hundreds, if not thousands, of members in the proposed class. Class members may be identified from records maintained by Inari or its transfer agent and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions.

110.    Plaintiff's claims are typical of all other class members' claims, as all class members are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws complained of herein.

111.    Plaintiff will fairly and adequately protect the interests of the class members and has retained counsel competent and experienced in class and securities litigation.

112.    Common questions of law and fact exist as to all class members and predominate over any questions solely affecting individual class members. Among the questions of law and fact common to the class are: (i) whether Defendants' acts and omissions as alleged herein violated the federal securities laws; (ii) whether Defendants' statements to the investing public during the Class Period misrepresented or omitted material facts about Inari's operations, business, performance, and future prospects; (iii) to what extent the class members have sustained damages; and (iv) the proper measure of such damages.

113.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable. Furthermore, as the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it impossible for class members to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.   CAUSES OF ACTION

### COUNT I
### Violation of Section 10(b) of the Exchange Act Against All Defendants

114.     Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein. This claim is brought against Defendants under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

115.     During the Class Period, Defendants used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange to make materially false or misleading statements and omissions of material fact alleged herein to: (i) deceive the investing public, including Plaintiff; (ii) cause the market price of Inari common stock to trade above its true value; and (iii) cause Plaintiff as well as other class members to purchase Inari common stock at artificially inflated prices that did not reflect the stock's true value during the Class Period. In furtherance of their unlawful scheme, plan, or course of conduct, Defendants took the actions alleged herein.

116.     While in possession of material adverse non-public information, Defendants, individually and in concert, directly or indirectly, by the use of means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange: (i) employed devices, schemes, and artifices to defraud; (ii) made false or misleading statements of material fact and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Inari common stock, in violation of Section 10(b) and Rule 10b-5. Defendants are alleged as primary participants in the wrongful conduct alleged herein.

117.    Defendants acted with knowledge or a reckless disregard for the truth of the materially misrepresented and omitted facts alleged herein in that they failed to disclose such facts even though such facts were readily available to them, if not known. Defendants' material misrepresentations and omissions were made knowingly and/or recklessly for the purpose and effect of concealing the truth regarding Inari's operations, business, performance, and future prospects from the investing public and supporting the artificially inflated price of its common stock.

118.    As set forth above, the dissemination of the materially false or misleading information and failure to disclose material facts artificially inflated or maintained artificial inflation already incorporated in the market price of Inari common stock during the Class Period.

119.    Plaintiff and other class members purchased or otherwise acquired Inari common stock during the Class Period at artificially inflated prices in direct or indirect reliance on: (i) the materially false or misleading statements made by Defendants; (ii) the efficiency and integrity of the market in which the Company's common stock trades; and (iii) the absence of material adverse information that Defendants knew of or recklessly disregarded but did not publicly disclose. As the previously misrepresented and/or concealed material facts eventually emerged, the price of Inari common stock substantially declined, causing losses to Plaintiff and other class members.

120.    At the time of the material misrepresentations and omissions alleged herein, Plaintiff and other class members were not aware of their falsity and believed them to be true. Had Plaintiff and other class members known the relevant truth regarding Inari's financial results, operations, business, and prospects, which was misrepresented and/or concealed by Defendants, Plaintiff and other class members would not have purchased Inari common stock at artificially inflated prices.

121.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other class members suffered damages in connection with their transactions in the Company's common stock during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

122.    Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein. This claim is brought against the Individual Defendants under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

123.    Prior to and during the Class Period, the Individual Defendants, by virtue of their high-level positions, were privy to, and monitored, confidential and proprietary information concerning Inari, its business, operations, performance, and future prospects, including its compliance with applicable federal, state, and local laws and regulations.

124.    In their respective roles, the Individual Defendants had regular access to non-public information about Inari's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other of Inari's corporate officers and employees, attendance at management meetings and meetings of the Company's Board of Directors and committees thereof, as well as reports and other information provided to them in connection therewith.

125.    Each of the Individual Defendants was a controlling person of Inari within the meaning of Section 20(a), as alleged herein. By virtue of their high-level positions, their participation in or awareness of the Company's day-to-day operations and finances, and/or knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants each had the power and authority to influence and control, and did

influence and control, directly or indirectly, the day-to-day decision-making of the Company, including the content and dissemination of the statements Plaintiff alleges were materially false and misleading.

126.     Each of the Individual Defendants is liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers of Inari common stock during the Class Period, which included the dissemination of materially false or misleading financial statements and statements (both affirmative statements and statements rendered misleading because of material omissions) set forth above. The scheme: (i) deceived the investing public regarding Inari's operations and the true value of Inari's common stock; and (ii) caused Plaintiff and other class members to purchase Inari common stock at artificially inflated prices, which plummeted in value when the truth concerning Inari's business, operations, performance, and future prospects was revealed.

127.     The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements Plaintiff alleges were materially misleading prior to and/or shortly after these statements were issued and had the ability and ultimate authority to prevent the issuance of these statements or cause these statements to be corrected. In particular, the Individual Defendants maintained direct and supervisory involvement in the day-to-day operations of the Company and therefore had, or are presumed to have had, the power to control or influence the particular public statements or omissions giving rise to the securities violations as alleged herein and exercised the same.

128.     As set forth above, Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged herein. By virtue of the Individual Defendants' status as controlling persons and their respective participation in the underlying violations of Section 10(b) and Rule

10b-5, the Individual Defendants are liable under Section 20(a).

129.    As a direct and proximate result of the Individual Defendants' culpable conduct, Plaintiff and other class members suffered damages in connection with their transactions in Inari's common stock during the Class Period.

## XIII.   PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for relief and judgment, including:

1.    Certification of this action as a class action;

2.    Awarding compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon, as allowed by law;

3.    Awarding Plaintiff its costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

Awarding such other and further relief as may be just and proper.

## XIV.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 18, 2024                               Respectfully submitted,

**KAPLAN FOX & KILSHEIMER LLP**

*/s/ Jeffrey P. Campisi*
Jeffrey P. Campisi
Pamela Mayer
Brandon Fox
800 Third Avenue, 38th Floor
New York, NY 10022
T: (212) 687-1980
F: (212) 687-7714
jcampisi@kaplanfox.com
pmayer@kaplanfox.com
bfox@kaplanfox.com

*Counsel for Plaintiff and the Proposed Class*

## CERTIFICATION

I, Paul Hartmann, hereby certify and swear as follows:

1. I have reviewed a complaint against Inari Medical, Inc. alleging violations of the securities laws and authorize the filing of a complaint or the filing of a lead plaintiff motion;

2. I am willing to serve as a representative party on behalf of a class, or to be a member of a group representing a class, including providing testimony at deposition and trial, if necessary;

3. I have not within the 3-year period preceding the date hereof sought to serve, or served, as a representative party on behalf of a class in an action brought under the federal securities laws;

4. My transactions in Inari Medical, Inc. common stock during the proposed class period are set forth in Schedule A, which is attached hereto.

5. I did not purchase Inari Medical, Inc. common stock at the direction of my counsel or in order to participate in any private action under the federal securities laws; and

6. I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Date: _June 17_, 2024

_____
Paul Hartmann

**Schedule A**

**Paul Hartmann Transactions in Inari Medical, Inc.**

| Security Description | CUSIP | Transaction | Date | Quantity | Price |
|---|---|---|---|---|---|
| INARI MEDICAL INC | 45332Y109 | Bought | 3/18/2021 | 3,000 | $104.93 |
| INARI MEDICAL INC | 45332Y109 | Bought | 3/18/2021 | 3,000 | $104.10 |
| INARI MEDICAL INC | 45332Y109 | Sold | 3/18/2021 | (3,000) | $107.90 |
| INARI MEDICAL INC | 45332Y109 | Sold | 3/18/2021 | (3,000) | $107.50 |
| INARI MEDICAL INC | 45332Y109 | Bought | 3/23/2021 | 3,000 | $109.80 |
| INARI MEDICAL INC | 45332Y109 | Bought | 3/24/2021 | 1,000 | $103.56 |
| INARI MEDICAL INC | 45332Y109 | Bought | 3/29/2021 | 2,000 | $99.50 |
| INARI MEDICAL INC | 45332Y109 | Sold | 3/31/2021 | (2,000) | $104.90 |
| INARI MEDICAL INC | 45332Y109 | Sold | 3/31/2021 | (1,000) | $106.49 |
| INARI MEDICAL INC | 45332Y109 | Bought | 4/5/2021 | 3,000 | $105.55 |
| INARI MEDICAL INC | 45332Y109 | Bought | 4/5/2021 | 3,000 | $105.51 |
| INARI MEDICAL INC | 45332Y109 | Sold | 4/6/2021 | (3,000) | $107.90 |
| INARI MEDICAL INC | 45332Y109 | Sold | 4/6/2021 | (3,000) | $111.21 |
| INARI MEDICAL INC | 45332Y109 | Sold | 4/6/2021 | (3,000) | $111.11 |
| INARI MEDICAL INC | 45332Y109 | Bought | 4/12/2021 | 3,000 | $108.60 |
| INARI MEDICAL INC | 45332Y109 | Sold | 4/12/2021 | (3,000) | $113.15 |
| INARI MEDICAL INC | 45332Y109 | Bought | 4/14/2021 | 3,000 | $107.80 |
| INARI MEDICAL INC | 45332Y109 | Bought | 4/14/2021 | 3,000 | $108.31 |
| INARI MEDICAL INC | 45332Y109 | Bought | 4/14/2021 | 3,000 | $108.45 |
| INARI MEDICAL INC | 45332Y109 | Bought | 4/14/2021 | 3,000 | $108.50 |
| INARI MEDICAL INC | 45332Y109 | Bought | 4/14/2021 | 3,000 | $109.50 |
| INARI MEDICAL INC | 45332Y109 | Bought | 4/16/2021 | 3,000 | $104.60 |
| INARI MEDICAL INC | 45332Y109 | Bought | 4/16/2021 | 327 | $104.50 |
| INARI MEDICAL INC | 45332Y109 | Bought | 4/16/2021 | 100 | $104.78 |
| INARI MEDICAL INC | 45332Y109 | Bought | 4/16/2021 | 2,700 | $104.80 |
| INARI MEDICAL INC | 45332Y109 | Bought | 4/16/2021 | 100 | $104.76 |
| INARI MEDICAL INC | 45332Y109 | Bought | 4/16/2021 | 100 | $104.77 |
| INARI MEDICAL INC | 45332Y109 | Sold | 4/22/2021 | (3,000) | $107.89 |
| INARI MEDICAL INC | 45332Y109 | Sold | 4/26/2021 | (3,000) | $111.39 |
| INARI MEDICAL INC | 45332Y109 | Sold | 4/26/2021 | (2,700) | $110.40 |
| INARI MEDICAL INC | 45332Y109 | Sold | 4/26/2021 | (3,000) | $112.30 |
| INARI MEDICAL INC | 45332Y109 | Sold | 4/26/2021 | (3,000) | $111.90 |
| INARI MEDICAL INC | 45332Y109 | Bought | 5/4/2021 | 3,000 | $108.50 |
| INARI MEDICAL INC | 45332Y109 | Bought | 5/4/2021 | 3,000 | $106.95 |
| INARI MEDICAL INC | 45332Y109 | Bought | 5/4/2021 | 3,000 | $107.54 |
| INARI MEDICAL INC | 45332Y109 | Bought | 5/4/2021 | 3,000 | $107.57 |
| INARI MEDICAL INC | 45332Y109 | Bought | 5/4/2021 | 2,780 | $107.80 |
| INARI MEDICAL INC | 45332Y109 | Bought | 5/4/2021 | 120 | $107.75 |
| INARI MEDICAL INC | 45332Y109 | Bought | 5/4/2021 | 100 | $107.74 |
| INARI MEDICAL INC | 45332Y109 | Bought | 5/4/2021 | 3,000 | $107.99 |
| INARI MEDICAL INC | 45332Y109 | Sold | 12/30/2021 | (3,000) | $93.50 |
| INARI MEDICAL INC | 45332Y109 | Sold | 12/30/2021 | (3,000) | $93.50 |

| | | | | | |
|---|---|---|---|---|---|
| INARI MEDICAL INC | 45332Y109 | Sold | 12/30/2021 | (3,000) | $93.40 |
| INARI MEDICAL INC | 45332Y109 | Sold | 12/30/2021 | (3,000) | $94.07 |
| INARI MEDICAL INC | 45332Y109 | Sold | 12/30/2021 | (2,780) | $93.50 |
| INARI MEDICAL INC | 45332Y109 | Sold | 12/31/2021 | (3,000) | $94.10 |
| INARI MEDICAL INC | 45332Y109 | Bought | 1/10/2022 | 3,000 | $82.00 |
| INARI MEDICAL INC | 45332Y109 | Bought | 1/10/2022 | 3,000 | $83.00 |
| INARI MEDICAL INC | 45332Y109 | Bought | 1/10/2022 | 3,000 | $82.75 |
| INARI MEDICAL INC | 45332Y109 | Sold | 1/11/2022 | (3,000) | $92.80 |
| INARI MEDICAL INC | 45332Y109 | Bought | 1/13/2022 | 3,000 | $82.19 |
| INARI MEDICAL INC | 45332Y109 | Bought | 1/14/2022 | 3,000 | $77.50 |
| INARI MEDICAL INC | 45332Y109 | Bought | 1/18/2022 | 3,000 | $75.50 |
| INARI MEDICAL INC | 45332Y109 | Sold | 3/9/2022 | (100) | $98.53 |
| INARI MEDICAL INC | 45332Y109 | Sold | 3/9/2022 | (100) | $98.53 |
| INARI MEDICAL INC | 45332Y109 | Sold | 3/9/2022 | (45) | $98.55 |
| INARI MEDICAL INC | 45332Y109 | Sold | 3/9/2022 | (100) | $98.52 |
| INARI MEDICAL INC | 45332Y109 | Sold | 3/9/2022 | (2,435) | $98.50 |
| INARI MEDICAL INC | 45332Y109 | Sold | 3/9/2022 | (2,780) | $99.50 |
| INARI MEDICAL INC | 45332Y109 | Bought | 3/10/2022 | 2,291 | $83.00 |
| INARI MEDICAL INC | 45332Y109 | Bought | 3/10/2022 | 300 | $82.99 |
| INARI MEDICAL INC | 45332Y109 | Bought | 3/10/2022 | 400 | $82.98 |
| INARI MEDICAL INC | 45332Y109 | Bought | 3/10/2022 | 9 | $82.92 |
| INARI MEDICAL INC | 45332Y109 | Bought | 3/10/2022 | 3,000 | $79.75 |
| INARI MEDICAL INC | 45332Y109 | Sold | 3/31/2022 | (3,000) | $93.00 |
| INARI MEDICAL INC | 45332Y109 | Bought | 1/23/2023 | 3,000 | $62.65 |
| INARI MEDICAL INC | 45332Y109 | Bought | 1/27/2023 | 3,000 | $60.05 |
| INARI MEDICAL INC | 45332Y109 | Sold | 5/9/2023 | (3,000) | $69.54 |
| INARI MEDICAL INC | 45332Y109 | Sold | 5/9/2023 | (3,000) | $69.45 |
| INARI MEDICAL INC | 45332Y109 | Bought | 5/25/2023 | 3,000 | $59.79 |
| INARI MEDICAL INC | 45332Y109 | Bought | 5/26/2023 | 3,000 | $58.95 |
| INARI MEDICAL INC | 45332Y109 | Bought | 11/3/2023 | 3,000 | $48.04 |
| INARI MEDICAL INC | 45332Y109 | Sold | 12/14/2023 | (3,000) | $66.70 |
| INARI MEDICAL INC | 45332Y109 | Sold | 12/14/2023 | (3,000) | $66.70 |
| INARI MEDICAL INC | 45332Y109 | Sold | 12/21/2023 | (3,000) | $64.96 |